IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 24, 2011

## STATE OF TENNESSEE v. TINA GAIL WILLIAMSON

**Appeal from the Circuit Court for Rutherford County**
**No. F-61007      Don R. Ash, Judge**

———————————————

**No.  M2010-01978-CCA-R3-CD - Filed March 13, 2012**

———————————————

Appellant, Tina Gail Williamson, was convicted by a Rutherford County Jury of second degree murder, felony murder, and especially aggravated robbery.  The trial court merged the second degree murder conviction into the felony murder conviction.   Appellant was sentenced to life plus twenty years.   On appeal, Appellant argues that the circumstantial evidence was insufficient to support her convictions and that the trial court erred in instructing the jury with a sequential jury instruction.  We have thoroughly reviewed the record on appeal and have concluded that the circumstantial evidence presented is sufficient to support the conviction.  With regard to the jury instructions, Appellant has failed to include them in the record.  It is Appellant's responsibility to do so.  Therefore, we are unable to review this issue and it is waived.  For these reasons, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., Joined.

Patricia L. Snyder, Nashville, Tennessee, for the appellant, Tina Gail Williamson.

Robert E. Cooper, Jr., Attorney General and Reporter, Leslie E. Price, Assistant Attorney General; William Whitesell, District Attorney General, and Jude Santana, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

At the time of his death, the victim, General William Rains, was eighty-three years old. He was a retired state trooper living at home and his wife was living in a nursing home. Appellant's husband met the victim at a flea market. The victim began spending a great deal of time with Appellant and her family. He was included in family gatherings at holidays as well as at cookouts at Appellant's house and outings with Appellant's children and grandchildren. Appellant was also seen on a regular basis around town in the company of the victim.

At some point, Appellant and the victim started a used car business together where they would buy and sell used cars. As part of their business, the victim and Appellant had a joint money market account. Because of the nature of the bank account, the restrictions required the balance to be maintained at $10,000 to prevent the loss of the interest earned by the account. The victim was very careful about maintaining the account balance above $10,000.

On Saturday, September 1, 2007, the victim was found dead in his house. The body was found sitting at the kitchen table dressed in an undershirt and boxer shorts. The cause of death was determined to be five gunshot wounds to the head. Three shots were made at distance range; one shot was made at close range; and one shot was made a contact range. The bullets recovered from the victim's body and one recovered from his lap were .22 caliber 40 grain weight long rifle round-nosed bullets. They were marked with an "F" indicating they were the Federal brand. The medical examiner, Dr. Feng Li, also determined that there was a blunt force injury to the back of the victim's head. Dr. Li concluded that the victim's death occurred shortly before or shortly after 12:00 p.m. on August 31, 2007.

After searching the victim's house, the officers could not find any evidence of forced entry. Several items of value were left in the house. The officers opined that the victim's house had been staged to look like a burglary. The officers collected several items as evidence. Included in those items were the boxer shorts that the victim was wearing at the time of his death. Testing showed that the "penile access port" of the boxer shorts contained DNA from both the victim and Appellant. At trial, the Tennessee Bureau of Investigation ("TBI") agent opined that the presence of Appellant's DNA on the boxer shorts at that location would be consistent with the victim getting dressed in his boxers immediately after he and Appellant had sexual intercourse. Additional witnesses testified to details that lead

-2-

to the conclusion that Appellant and the victim had a sexual relationship as well as a business relationship.

Appellant told officers that on the day in question, Friday, August 31, 2007, the victim picked her up at her house, took her to breakfast, they ran some errands, and the victim dropped her off at her house around 11:00 a.m. She denied that they had a sexual relationship.

The evidence presented by the State established a much different scenario. A witness testified that around 8:30 a.m. on August 31, he saw the victim waiting in his car in Appellant's driveway. Appellant and the victim were seen having breakfast at Hardee's in Woodbury, Tennessee, around 9:00 a.m. A bank employee testified that the victim came into the bank alone around 9:00 a.m. and withdrew $489 from the money market account he held jointly with Appellant.

Detective Ty Downing with the Rutherford County Sheriff's Department, obtained Appellant's cellular telephone records. He discovered that Appellant made a cellphone call to Betty Olson at 11:21 a.m. on the day in question. The call was routed through the cellphone tower closest to the victim's house. Appellant made additional calls to Ms. Olson at 11:30 a.m. and 12:03 p.m. Both of these calls were routed through the same tower. Ms. Olson told Detective Downing that on the day in question, Appellant called her in an excited state and asked Ms. Olson to come pick her up. She picked Appellant up around 12:00 p.m. near a Wal-Mart on John Bragg Highway. The location was determined to be about a ten-minute walk from the victim's house.

Detective Downing was able to convince Ms. Olson to contact Appellant and have officers record their conversations. There was more than one recorded conversation between Ms. Olson and Appellant. During the conversations, Appellant repeatedly told Ms. Olson that she should not tell the police that she picked up Appellant near the victim's house on August 31, 2007. Appellant told Ms. Olson she had an alibi for that time. She told Ms. Olson that the victim was carrying between $1,500 and $1,800 at the time he was murdered. Appellant told Ms. Olson that she was doing better when the victim was alive because he would always give her money.

Around 2:00 p.m on the afternoon of August 31, 2007, Appellant withdrew $1,500 from the money market account at First Bank that she held with the victim. This withdrawal brought the account balance below $10,000. The bank employees noticed that Appellant was visibly shaking while at the bank. She told them they would not see the victim later that day because he had a dentist appointment. It was later discovered that the victim's dentist office was not open that day. The bank employees were concerned because Appellant's withdrawal

-3-

had taken the account balance below $10,000. They called the victim to let him know, but he did not answer his telephone. At 2:06 p.m., Appellant made a cash deposit of $1,900 in her personal bank account at First National Bank in Manchester.

Late on August 31, 2007 or early on September 1, 2007, Appellant called her friend Kim Blanton. Appellant asked Ms. Blanton for some valium. Ms. Blanton testified that the call was unusual. When Appellant paid for the valium, she paid in cash and had a lot of "wadded up" money. Appellant also called Ms. Blanton at 7:30 p.m. on September 1, 2007, and started talking about money. She said "money, money, money." Appellant's husband got on the telephone and told Ms. Blanton that Appellant was having a "sugar attack."

On September 6, 2007, Appellant came to First Bank to close the money market account that she held with the victim. The bank employees noticed that Appellant was again shaking uncontrollably while at the bank. On that same day, Appellant presented a cashier's check made out to her at First National Bank in Manchester. She deposited $3,000 in her checking account and $2,000 in a savings account. She took the remaining $5,000.23 in cash.

A few days later, Appellant came to cash out a $100,000 Certificate of Deposit ("CD") set up by the victim. Appellant was the beneficiary of the CD. The bank manager told Appellant that she did not have the proper documentation because the CD was blank. Ms. Jamie Slatton, a friend of Appellant, was in the bank that day. She said that Appellant was "messed up" and Ms. Slatton thought that Appellant was on drugs. Appellant told her that she wanted to get a cashier's check that day because she thought the bank tellers were trying to "put her off." Appellant returned the following day, but she did not have the victim's death certificate. As a result she was unable to cash out the CD.

On September 6, 2007 and October 24, 2007, officers executed two separate search warrants at Appellant's house. They found various guns and ammunition. Officers found an empty box for a Federal Arms .22 caliber short rifle ammunition. In a nightstand in the master bedroom, officers found a .22 caliber Smith and Wesson long rifle six-shot revolver containing six rounds of ammunition. The ammunition in the Smith and Wesson was not the Federal brand. Also found at Appellant's home was a box of Federal ammunition. The box was labeled that it contained 50 bullets. However, when officers looked inside the box, they discovered that the box contained 45 Federal bullets and five bullets had been replaced with other brands. The bullets found in the box at Appellant's house appeared to be like the bullets found at the crime scene. Agent Dan Royse with the Violent Crimes Unit of the TBI test-fired the Smith and Wesson found in the nightstand at Appellant's house. He testified that the bullets he test-fired from the weapon in question had the same class characteristics

as the bullets recovered at the scene. He stated he could not exclude the Smith and Wesson as being the murder weapon.

Officers also found many other items of note. They found two newspapers with headlines and news stories about the investigation into the victim's murder. They found unlabeled bottles with mixtures of prescription medication. They found the keys to the victim's Mercedes. They found the receipt book for rent from the tenants living in his rental properties and a deed conveying a life estate from the victim to Appellant in a duplex in which her daughter was living at the time. Officers also found many personal documents and photographs belonging to the victim including: his wallet; his old union cards; his social security card; a military identification card that expired in 1972; a hospital insurance card; and two vehicle insurance cards.

On September 7, 2007, Detective Downing and Detective Ralph Mayercik interviewed Appellant at the sheriff's department. Appellant brought notes with her to the interview. She also brought a checkbook. Detective Downing asked if he could make copies of the register. As he was looking through the register, he discovered the title to the victim's 1988 Mercedes. He noticed that the title had a drop on it of what appeared to be blood. The drop was later tested by the TBI and was determined to match a sample of the victim's blood. When she was asked about the title, Appellant told the detectives that the victim did not want his son to have the car and that he had given it to her. However, the title had not been endorsed over to her or anyone else.

Detectives Downing and Mayercik also questioned Appellant about her visit to the bank the afternoon of August 31, 2007. She said that she was physically fine when she went to the bank. The detectives told Appellant that employees at the bank had described her as shaking and upset while she was there that afternoon. She told them that her diabetes must have caused the shaking. Detective Downing also asked Appellant if the victim had a dentist appointment the day in question. She replied that the victim did not have a dentist appointment scheduled that day and, if he had, she would have known about it. During the interview, Appellant admitted that she was taking pain medication other than that prescribed by a doctor. Detective Downing discovered that Appellant was obtaining the medication in other ways.

Appellant told the detectives her theory about the victim's murder. She told them that an African-American man who drives a gold- or champagne-colored Mercedes was mad at the victim. She stated that she believed that the man waited on the victim and crept up on him. Detective Downing located an African-American man who drove a car matching Appellant's description, but he could not find any connection between him and the victim.

Two individuals who were incarcerated with Appellant before trial also testified for the State. Gretta Adams was incarcerated with Appellant. Ms. Adams was incarcerated from October 2007 to January 2008 for a misdemeanor. She testified that Appellant told her that the victim was a pervert. Appellant told Ms. Adams that the victim would visit his wife in the nursing home every Friday, but he did not go the Friday he was murdered. She also told Ms. Adams that the murder did not happen the way that the police thought it did. Appellant said she had made a snap decision that ended someone's career.

Once, Appellant mentioned that the police had a weapon that they had already analyzed and found to be clean. Appellant said that the gun belonged to the victim. Ms. Adams said that Appellant never claimed to be innocent, but instead would say that the police "alleged" that she had committed the offense. Ms. Adams related two events where Appellant became upset with fellow inmates and physically attacked them.

Vanessa Fleming was also in jail with Appellant. She saw Appellant vomiting. Appellant told the other inmates she was coming off of morphine. This prompted Ms. Fleming to ask if Appellant was high when she killed the victim. Appellant responded that she was "soberer than [she had] ever been in [her] whole life." Ms. Fleming asked if Appellant had been "going crazy" because she wanted more drugs. Appellant responded that she was not. Ms. Fleming told Appellant that she did not understand why someone would shoot somebody, particularly when they were in their eighties. Appellant asked Ms. Fleming how she would feel about shooting someone if they had "put his hands on your baby girl." Ms. Fleming asked how old Appellant's daughter was, and Appellant replied that she was twenty-three or twenty-four.

Because of this conversation, Ms. Fleming asked the trustees to move Appellant to another location in the jail. Appellant overheard Ms. Fleming's request and attacked her. Ms. Fleming was moved to another location.

Appellant also presented proof at the trial. Ron Williamson, Appellant's husband, stated that he met the victim at a flea market in Woodbury about four years before the victim was murdered. He said that they became friends and that he introduced the victim to Appellant a few months later. Mr. Williamson considered the victim to be a part of his family. The victim attended many of the Williamson family's gatherings. Mr. Williamson stated that the victim thought of Appellant as a daughter and denied that Appellant and the victim had a romantic relationship.

According to Mr. Williamson, Appellant was involved in car accident on May 4, 2004. As a result of the accident, she sustained a back injury and began taking morphine. Appellant became addicted to morphine, but Mr. Williamson did not learn about her abuse

of prescription medication until a year and a half later. He said that Appellant was on medication when she was interviewed by the police.

Because of the back injury, Appellant's mobility was limited. She quit work and eventually stopped driving. Mr. Williamson stated that he and Appellant did not have any financial problems. He also stated that he did not know that Ms. Olson picked up Appellant in Murfreesboro on the date in question until Appellant was released on bond.

Mr. Williamson testified that he sold a North American Arms five-shot long rifle to Willie Lack. However, Mr. Williamson stated that Mr. Lack did not take the gun box along with the gun. Mr. Williamson claimed that he loaded the gun with five bullets from a box of Federal Arms .22 long rifle ammunition. However, the empty gun box found at Appellant's house was for a Federal Arms .22 short rifle. He explained that the bullets could have come from the box the officers found in his house that contained five different bullets. Mr. Williamson also stated that shells for the Smith and Wesson gun were spread throughout his house.

Mr. Williamson testified that he has never seen Appellant fire a pistol. However, Danny Alsup, Appellant's ex-husband testified that Appellant was in ROTC during school. Mr. Williamson stated that he bought a Smith and Wesson .22 revolver for Appellant. He said that she kept it in her nightstand, and he bought it for home protection. The police seized the weapon when they searched Appellant's home and tested it. As far as Mr. Williamson knew, this was the only weapon that Appellant owned. Mr. Williamson stated that he had twelve to fifteen weapons in the house at the time it was searched. The police seized six.

Mr. Williamson testified that the victim gave a durable power of attorney to him and Appellant for medical purposes if the victim became ill. The victim also put Appellant's name on a $100,000 joint CD. The victim and Appellant had a joint money market account with a balance of $10,000 that they used to buy and sell cars. Mr. Williamson testified that Appellant obtained the title and keys to the victim's Mercedes before his death. According to Mr. Williamson, the victim wanted Appellant to have the Mercedes. Also, the victim deeded a remainder interest to Appellant for the duplex in which her daughter was living.

On August 31, 2007, Mr. Williamson arrived home at 7:15 p.m. to find Appellant asleep on the couch. He did not recall her acting strangely on either August 31, or September 1. They became worried about the victim because they had made numerous calls, but he had not called them back. They went to his house around 8:00 p.m. on September 1, 2007. Appellant had a key to the house, and they used it to enter the house. Appellant went to check the bedroom, and he checked the kitchen. Mr. Williamson found the victim in the

kitchen. He and Appellant left the house, and he called 911. Mr. Williamson stated that Appellant was "hysterical."

Robert Motter is the boyfriend of Appellant's daughter, Jessica Alsup. They lived in the duplex behind the victim's residence at the time of his death. Mr. Motter stated that he regularly saw different cars in the victim's driveway. He stated that the victim sold moonshine. He said that a few days before the victim was murdered, he saw an African-American male, who had a "gangster look" about him, leave the victim's house. The African-American male got into a champagne-colored Mercedes. Mr. Motter became concerned and gave him "the mean eye." After the man left, Mr. Motter went to check on the victim, and Mr. Motter felt that the victim was acting nervous. Mr. Motter told the police and Appellant about the man. Mr. Motter later identified the man in a line-up.

On August 31, 2007, Mr. Motter saw Appellant in the victim's carport at 7:45 a.m. He had just arrived home from work. He went into the duplex and went to sleep. When he awoke later that day, the victim's car was at the house. When Appellant and his girlfriend learned that the victim had been killed they spoke with Appellant. Appellant told them that she had been home all day.

Jessica Alsup is the daughter of Appellant and Danny Alsup. She lived in the duplex behind the victim's house with Mr. Motter. On August 31, 2007, Ms. Alsup left for work at 7:00 a.m. She came home for lunch at 12:00 p.m. and returned to work. She arrived home from work at 4:30 p.m. She did not remember seeing anything unusual that day. On September 1, 2007, Appellant called her to tell her that the victim had been found dead in his house. Ms. Alsup went home and there were police at the victim's house when she arrived.

Jeffrey Ross lives near the victim's house. He lives close enough so that he can see vehicles coming and going from the victim's house. He returned home from work on August 31, 2007, at 2:00 p.m. He heard a "crack" about an hour after he returned home. However, he said such an occurrence was not unusual because kids were often setting off fireworks or shooting at birds.

Mr. Ross stated that he saw Appellant outside of the victim's house on the day the victim's body was discovered. He spoke with her and said she was crying "crocodile tears." He said that he thought she was engaging in "deliberate wailing." Mr. Ross said that Appellant was answering questions that no one was asking, such as where she was at the time of the murder.

Chris Alexander had known the victim for about a year before his death. Mr. Alexander met the victim at the Spot Café. The victim told Mr. Alexander that he sold

moonshine. Mr. Alexander stated that he bought moonshine from the victim on many occasions. When he purchased the moonshine, Mr. Alexander would go to the victim's house and the victim would bring the moonshine out to his car. He testified that he did not know Appellant, but when they would speak of girlfriends, the victim would talk about a "young girl" or "this other lady."

Britt Knox lived across the street a few houses down from Appellant. Appellant and her husband moved into the neighborhood in 2002. Mr. Knox paid Appellant's bond of $20,000 and paid $10,000 for a private investigator to help with the case. Mr. Knox stated that Appellant helped care for his mother.

On August 31, 2007, Mr. Knox looked out his office window around 10:30 a.m. and saw Appellant in her carport. When he looked out of the window later, Appellant was no longer in the carport, but the backdoor was open. He noticed there was white SUV in the driveway which he assumed was Mr. Williamson's ex-wife's car. Shortly thereafter, he looked out his window again and saw that the backdoor was closed. He assumed that Appellant was taking a nap. He did not see Appellant again that day until 3:00 p.m.

Mr. Knox did not learn until September 2, 2007, that the victim had been killed. After he learned about the murder, he began his own investigation of the murder. Mr. Knox stated that according to his investigation, it would have taken Appellant much longer than 10 to 15 minutes to walk to where Ms. Olson picked her up on August 31, 2007. He estimated that it would have taken Appellant an hour to cover the distance in question. However, he agreed that he did not know the exact distance from the victim's house to the location where Appellant was picked up. He also testified that there was a shortcut from the victim's house to the road that would have taken a much shorter time.

Mr. Knox also doubted whether Appellant could shoot a gun. He stated that her physical state was such that her hands sometimes shook. He did not believe that she had the steadiness to shoot in a tight pattern. He said that he had never seen Appellant shoot a weapon. He acknowledged that he had never shot a .22 caliber weapon. He agreed that a steady hand was needed to write a check.

On September 18, 2007, Mr. Knox spoke with Detective Mayercik. He told Detective Mayercik that on August 31, 2007, the only car he saw at Appellant's house was her mother's gray mini-station wagon. He did not mention the white SUV. He could not tell Detective Mayercik whether Appellant left with the victim that morning. He was also not aware that Appellant was in Murfreesboro the day of the murder. Mr. Knox claimed that he was intoxicated the first time he spoke with Detective Mayercik.

On rebuttal, the State presented two witnesses, Detective Todd Sparks of the Rutherford County Sheriff's Department, and David Johnson.

Detective Sparks assisted Detective Mayercik in his investigation. Detective Sparks located a goldish-colored 1980's model Mercedes. The car was registered to a David Johnson. This car was the only car in Tennessee that fit the description. Mr. Johnson was identified in a photographic lineup. Detective Sparks concluded that Mr. Johnson was not involved in the victim's murder. Detective Sparks discovered that Mr. Johnson was working at the time of the murder. He also found no evidence that Mr. Johnson was acquainted with the victim.

Mr. Johnson stated that he was identified in a photographic lineup. He acknowledged that he owned a 1988 champagne-colored Mercedes in August 2007. Mr. Johnson testified that on August 31, 2007, he went to work and left around 3:00 p.m. He said after leaving work, he ran some errands and went home. Mr. Johnson stated that he had never met the victim, had never been in the victim's home, did not own a gun, and was not involved in the victim's murder.

Appellant was indicted by the Rutherford County Grand Jury for one count of first degree premeditated murder, one count of first degree felony murder, and one count of especially aggravated robbery. The above evidence was presented at a jury trial held January 27, 2009, through February 3, 2009. At the conclusion of the trial, the jury found Appellant guilty of second degree murder, felony murder, and especially aggravated robbery. The trial court merged the second degree murder conviction into the felony murder conviction. She was sentenced to life plus twenty years. Appellant filed a timely notice of appeal.

## ANALYSIS

### Sufficiency of the Evidence

On appeal, Appellant argues that the evidence is insufficient to sustain her convictions. The State disagrees. To begin our analysis, we note that when a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S .W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the

insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, as well as any fact required to be proved, may be established by direct evidence, by circumstantial evidence, or by a combination of both. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Recently, in *David Lynn Sisk*, the supreme court clarified the use of circumstantial evidence as a basis for a conviction. In *David Lynn Sisk*, the defendant was convicted of aggravated burglary and theft at trial, primarily on the basis of circumstantial evidence. 2011 WL 2350304, at *2. The circumstantial evidence involved a cigarette butt that was found at the scene and contained a match to the defendant's DNA. *Id.* On appeal, this Court reversed, holding that the evidence was insufficient to support the convictions for aggravated burglary and theft of $10,000 or more but less than $60,000. *Id.* at *1. The State appealed, arguing that the convictions should be reinstated. On appeal to the supreme court, the court chronicled the history of the use of convictions based on circumstantial evidence stating:

> Years ago, in *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610 (1971), this Court adopted a standard of proof in criminal prosecutions based exclusively upon circumstantial evidence that purportedly required the State to prove facts and circumstances "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *Id.* at 612. This Court also stated in *Crawford* that in such cases, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 613. This language was recited for years by Tennessee courts as controlling in those cases in which the sufficiency of exclusively

circumstantial evidence was at issue; indeed, it was used by both the Court of Criminal Appeals and the trial court in this case. *See Sisk*, 2010 WL 3502512, at \*2. In *State v. James*, 315 S.W.3d 440, 455 n.14 (Tenn. 2010), however, we pointed out the inconsistency between the terminology employed in *Crawford* and its progeny and the standard of proof applied by the United States Supreme Court in those cases in which the evidence is solely circumstantial. *See Jackson*, 443 U.S. at 326, 99 S. Ct. 2781 (rejecting the notion "that the prosecution [i]s under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt"). Finally, in *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011), we adopted the federal standard in Tennessee and eschewed any distinction between the standard of proof required in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State. Although we observed in *Dorantes* that, as a practical matter, there was little difference between the federal standard and the "reasonable hypothesis" language used in *Crawford*, we also noted that, depending on the nature of the circumstantial evidence presented at trial, the adoption of the federal standard of proof could result in a different outcome in some cases. *Id.*

*Id.* at \*4 (footnotes omitted). Based on that reasoning, the court reinstated the defendant's convictions, finding:

The undamaged condition of the cigarette butt, Detective Grooms' testimony that it was unlikely the cigarette had been tracked into the house and that the victims themselves were not smokers, the proximity of the Defendant's residence to the burglarized house, the fact that the Defendant often was seen smoking outside and had never been invited into the victims' residence, and the Defendant's flight from police on January 3, 2007, all corroborate the DNA evidence. While the intermediate appellate court posited that "[s]everal plausible explanations for the presence of the defendant's cigarette inside the victims' residence come to mind, including that the cigarette butt was 'tracked' into the residence," *Sisk*, 2010 WL 3502512, at \*3, our duty on appeal of a conviction is not to contemplate all plausible inferences in the Defendant's favor, but to draw all reasonable inferences from the evidence in favor of the State. Given Detective Grooms' description of the cigarette butt and its location [on the bottom of his shoe], it was perfectly reasonable for the jury to believe the State's theory that the Defendant had entered the victims' residence

during the burglary and left the cigarette butt there. The evidence is sufficient to support the jury's verdict.

*Id.* at \*6 (footnote omitted). By reinstating the convictions in *David Lynn Sisk*, our supreme court made clear that "[t]he standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Appellant presents several arguments finding fault with specific aspects of the evidence presented at trial. She admits that she lied about being in Murfreesboro the day of the murder. She states that the reason she lied was because she was trying to cover-up her addiction to prescription painkillers. She argues that this fact is the basis for her calls to Ms. Olson concerning not telling the police about giving her a ride in Murfreesboro the day of the murder. This argument was presented by Appellant at trial. Clearly, this theory was rejected by the jury. As stated above, it is not this Court's role to resolve factual issues raised by the evidence.

Appellant presents several arguments attacking specific evidence. She argues: (1) that the testimony of Agent Royse, Agent Hardy, and Dr. Li did not present any evidence linking Appellant to the murder; (2) that the Wal-Mart surveillance video showed an unidentified person and Appellant opines that the gender of the person is not identifiable; (3) that the testimony which was presented by the two women incarcerated with Appellant was never substantiated; (4) that there was no evidence introduced showing that Appellant and the victim had an argument before his murder; (5) that Appellant's withdrawals from her joint account held with the victim and the missing $489 withdrawn by the victim the day of his murder do not connect Appellant with the victim's murder; and (6) that the forensic evidence failed to link Appellant to the victim's death and created reasonable doubt.

These arguments are all based upon factual issues presented to the jury. As stated above, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Pruett*, 788 S.W.2d at 561. The issues raised by Appellant would require us to determine the credibility of the witnesses and the factual issues raised by the evidence presented. Such a decision is not this Court's role on appeal.

-13-

As stated above, our role on appeal is "to draw all reasonable inferences from the evidence in favor of the State." *David Lynn Sisk*, 2011 WL 2350304 at *6. Therefore, we now review the evidence to determine whether a reasonable jury could find Appellant guilty of first degree felony murder, second degree murder, and especially aggravated robbery.

First degree murder is felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy. . . ." T.C.A. § 39-13-202(a)(2). Second degree murder, is the unlawful and knowing killing of another. T.C.A. §§ 39-13-201, -10(a). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b). Pursuant to Tennessee Code Annotated section 39-13-401, robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear. Aggravated robbery is robbery that is "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or . . . the victim suffers serious bodily injury." T.C.A. § 39-13-402.

When the evidence is evaluated in a light most favorable to the State we conclude that a reasonable trier of fact could determine the following facts. The evidence showed that the relationship between Appellant and the victim was very close. One witness testified that the victim asked her to buy a dildo for him so he could use it with Appellant. She also stated that Appellant was very jealous of the witness's relationship with the victim. Another witness testified that he saw Appellant kiss the victim on the lips. Yet another witness stated that the victim referred to a girlfriend. In addition, many witnesses testified to seeing Appellant and the victim together often. They were seen at the bank arguing about money. According to the witness, Appellant was asking the victim "where he put the money." In addition, DNA testing showed that Appellant's DNA was present on the "penile access port" of the boxers worn by the victim when he was murdered. Agent Hardy testified that the presence of Appellant's DNA would be consistent with the victim putting on his boxers after he and Appellant engaged in sexual intercourse.

Appellant denied that she was at the victim's house on August 31, 2007. However, her daughter's boyfriend, Mr. Motter, who lived behind the victim, testified that he saw Appellant at the victim's residence at 7:45 that morning. In addition, Ms. Olson informed police that she picked up Appellant near the victim's residence around 12:00 p.m. the day of the victim's death. The police discovered several cellular telephone calls placed by Appellant to Ms. Olson that were routed through the cell phone tower nearest the victim's residence beginning at 11:21 a.m. and ending at 12:03 p.m. During the recorded telephone calls and conversations between Ms. Olson and Appellant, Appellant told Ms. Olson that the

police could not know that Ms. Olson gave her a ride on August 31, 2007. Appellant told Ms. Olson that she had an alibi for that morning as long as the police did not find out about the ride. Appellant and Ms. Olson discussed what story Ms. Olson could tell police to explain the telephone calls. There was also an individual walking along John Bragg Highway near the time of the telephone calls between Ms. Olson and Appellant in clothing matching the description of the clothing Appellant wore on August 31, 2007.

The bank employees testified that the victim came into the bank the morning of August 31, 2007. They said that he withdrew $489 from the joint money market account he held with Appellant. They also testified that the victim was very careful not to let the balance of the account go below $10,000. Later on August 31, 2007, the bank employees said that Appellant came into the bank. They described her as "violently shaking." Appellant made a withdrawal of $1,500 from the joint account that brought the balance below $10,000. Appellant then lied to the bank employees and told them that they would not see the victim later that day because he had a dentist appointment. The victim did not have an appointment and, in fact, the dentist office was not even open the day in question. Furthermore, when officers asked Appellant if the victim had a dentist appointment the day in question she said that he did not and if he did, she would have known about it. After Appellant left the bank, the employees called the victim about Appellant's withdrawal from the account. There was no answer. Appellant closed the account shortly after the victim's death. The bank teller stated that Appellant was shaking the day she closed the account. On August 31, 2007, Appellant made two deposits into her bank account at First Bank in Manchester on August 31, 2007. The first deposit was at 9:48 a.m. for $906.74 consisting of $380 in cash and a payroll check. The second deposit was at 2:07 p.m. for $1,900 in cash. Appellant told Ms. Olson that the victim had between $1,500 and $1,800 in cash when he was murdered.

The Assistant Manager at the victim's bank testified that Appellant attempted to cash out the $100,000 CD. She did not have the right documentation to cash out the CD. Ms. Slatton, a friend, saw her at the bank when she was trying to cash out the CD. The friend said that Appellant was talking very loudly and accusing the bank employees of trying to "put her off." Ms. Slatton believed that Appellant was on drugs because of her behavior at the bank.

When officers arrived at the scene of the victim's murder, they conducted an investigation of the scene. The officers found no point of forced entry into the house and stated that nothing of value appeared to be missing. They stated the house was staged to look like there had been a burglary. Dr. Li testified that the autopsy of the victim showed that the cause of death was multiple gunshot wounds to the head. There was also a blunt force trauma injury to the victim's head. Four bullets were recovered from the victim's head and another bullet was recovered at the scene.

The officers did not find any weapons in the house despite the fact that multiple witnesses testified that the victim traded guns. One pistol, an Iver Johnson .22 caliber, was found in the glove compartment of a pick-up truck belonging to the victim. Appellant told officers that the victim kept a Colt in his glove compartment and that the murderer must have stolen it. When they searched Appellant's house, officers discovered several firearms and boxes of ammunition. Among the weapons found, the officers found a .22 caliber Smith and Wesson long-rifle revolver containing six rounds of ammunition in the night stand. The Smith and Wesson had a blood stain on it that tested positive for human blood but the TBI was unable to generate a DNA profile from the stain. When this weapon was test-fired by the TBI, the four bullets recovered from the victim's head shared the same class characteristics of the bullets that were test-fired. The agent testified that this weapon could not be excluded as the murder weapon. The other weapons collected during the searches of Appellant's house were excluded as the murder weapon. Also during the searches, officers found a box of .22 caliber Federal bullets. The box stated on the front that it contained 50 bullets, but when officers opened the box they found 45 Federal bullets, and five other bullets from another manufacturer had been placed in the box. Testing had determined that the bullets used to kill the victim were five, Federal long rifle .22 caliber bullets.

Officers also discovered items of interest in Appellant's possession. At her house they discovered: several of the victim's personal belongings, including the keys to his Mercedes and his wallet containing various union cards; the deed to the duplex in which Appellant's daughter lived; various personal photographs of the victim; a health care durable power of attorney for the victim; and two CD's both for $100,000, one payable to Appellant and one payable to the victim and Appellant. Officers also found two newpapers with headlines about the investigation of the victim's murder.

During the interview of Appellant by the police, Detective Downing found the title to the victim's 1988 Mercedes in the checkbook brought by Appellant. The title was not signed over to Appellant, but she maintained that the victim had given it to her. In addition, Detective Downing noticed what appeared to be a drop of blood on the title. After testing by the TBI, it was determined that the drop of blood was the victim's blood.

When taken in a light most favorable to the State, we conclude that the evidence presented at trial is sufficient to support the convictions at hand.

### Jury Instructions

Appellant also argues that the jury instructions were unconstitutional because they directed sequential consideration of lesser included offenses. The State points out that

Appellant failed to include the jury instructions in the record on appeal and, therefore, the record is inadequate for review on this issue.

We have reviewed the record on appeal and conclude that the State's assertion is correct. The jury instructions are not included in the record. Appellant admits as much in her brief when she states in a footnote, "The Jury Instructions in *State v. Williamson*[,] *No. 61007, Rutherford County Circuit Court Div III,* were omitted from the Technical Record; a copy of the trial attorney's instructions are included in Appendix A." Appellant may reproduce and attach as an appendix to her brief those parts of the appellate record she deems essential for the Court to read in order to determine the issues raised. However, the documents Appellant attached are not part of the actual record received from the trial court and, therefore, cannot be considered by this Court as part of the official record on appeal. *State v. Matthews*, 805 S.W.2d 776, 784 (Tenn. Crim. App. 1990) (stating, "Rule 28, Tennessee Rules of Appellate Procedure, does not contemplate attaching a transcript of proceedings to a brief when the transcript has not been made a part of the record."). The proper procedure is to supplement the record with any documentation that is deemed necessary to present a parties' issues. Tenn. R. App. P. 24(e). Therefore, because Appellant has failed to include a copy of the jury charge in the record on appeal her issue is waivable. It is Appellant's duty to provide a complete record on appeal. *State v. Ballard*, 855 S.W.557 (Tenn. 1993).

Furthermore, even if the issue had not been waived, Appellant could not be successful on her issue. In her brief, she argues that the trial court erred in giving a sequential jury instruction. Such instructions have been upheld by our supreme court. In *State v. Davis*, 266 S.W.3d 896 (Tenn. 2008), our supreme court stated the following:

> [W]hile a defendant is entitled by our constitution to have the jury charged on all offenses encompassed within the indictment and supported by the proof, our constitution does not go so far as to mandate the order in which those offenses are considered. Our constitution also does not prohibit the requirement that a jury first reach a unanimous verdict of acquittal with respect to a greater offense before it proceeds to consider a defendant's guilt of a lesser-included offense. We therefore reject the Defendant's contention that the trial court's acquittal-first instructions in this case violated his state constitutional right to trial by jury.

266 S.W.3d at 905.

## CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.


_____

JERRY L. SMITH, JUDGE